# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| **JUSTINA PABON**, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>  v.<br><br>TRINITY HEALTH CORPORATION, AND HEALTH GORILLA INC.,<br><br>    Defendants. | Case No.<br><br>**CIVIL ACTION**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY DEMAND** |

Plaintiff Justina Pabon ("Plaintiff"), individually and on behalf of all others similarly situated, brings this action against Defendants Trinity Health Corporation ("Trinity") and Health Gorilla, Inc. ("Health Gorilla") (collectively, "Defendants"), and alleges the following based upon personal knowledge as to herself, the investigation of her counsel, and upon information and belief as to all other matters:

## NATURE OF THE ACTION

1. This class action arises out of the unauthorized access to and disclosure of the sensitive personal information and protected health information ("PHI") of Plaintiff and other patients of Defendant Trinity, facilitated through the health information exchange platform operated by Defendant Health Gorilla. Unlike a conventional data breach caused by external hackers, this case involves entities that gained access to a nationwide health information exchange framework by falsely representing that they needed patient records for treatment purposes, when their actual

1

purpose was to exploit those records for commercial gain, including, upon information and belief, providing patient records to law firms and other third parties for non-treatment purposes.

2. Defendant Trinity is one of the largest not-for-profit Catholic health systems in the United States, operating 92 hospitals across 25 states with more than 133,000 employees. In connection with providing healthcare services, Trinity collects, stores, and maintains highly sensitive patient information, including clinical care details, demographic information, insurance information, and driver's license numbers.

3. Defendant Health Gorilla is a health information network and interoperability platform that operates as a Qualified Health Information Network ("QHIN") under the federal Trusted Exchange Framework and Common Agreement ("TEFCA") and as an Implementer under the Carequality framework. In that capacity, Health Gorilla serves as a gatekeeper that controls which entities may access patient medical records through these nationwide data exchange frameworks. Health Gorilla's website promises "ironclad data security, privacy, and governance" that "protects patient data."[1]

4. On or about January 13, 2026, Trinity was notified by its health information exchange ("HIE") partner of a potential unauthorized disclosure of Trinity patients' protected health information. According to Trinity's notice, an entity connected to Health Gorilla submitted requests for patient records on behalf of certain other companies, representing that the records were needed for treatment purposes. The HIE was unable to verify those representations or confirm that the downstream recipient companies were authorized to obtain the requested information.

---

[1] Health Gorilla, Powerful Security, https://www.healthgorilla.com/ (last visited Mar. 23, 2026) ("We maintain an ironclad data security, privacy, and governance program that protects patient data.").

5. On or about March 13, 2026, Trinity began notifying affected patients. Trinity's breach notice stated that the health information that may have been disclosed "varies based on the content of the information exchanged but may have included clinical care details, demographic information, insurance information, and potentially driver license numbers."[2]

6. The scope of the broader unauthorized access scheme is substantial. According to a lawsuit filed on January 13, 2026, by Epic Systems Corporation, Trinity, and other healthcare providers against Health Gorilla in the United States District Court for the Central District of California (the "Epic Complaint"), Health Gorilla enabled multiple entities to improperly access approximately 300,000 patient medical records from healthcare providers who use Epic's electronic health record system.[3] Trinity is one of several Epic-using health systems whose patient records were accessed. The 300,000 figure represents only records accessed from Epic-using providers and does not account for records taken from providers using other electronic health record systems or from the U.S. Department of Veterans Affairs. The precise number of Trinity-specific patients affected has not been publicly disclosed as of the date of this filing.

7. The misconduct at issue is not speculative. On or about March 13, 2026, one of Health Gorilla's clients, GuardDog Telehealth, entered into a stipulated judgment and permanent injunction with Epic in the California litigation, in which GuardDog admitted that it had accessed patient medical records under false pretenses. GuardDog admitted that "since it began operating as a company in 2024, its goal was to provide chronic care management and remote patient

---

[2] *See* Vermont Att'y Gen., Security Breach Notice, https://ago.vermont.gov/document/2026-03-13-trinity-health-data-breach-notice-consumers (last visited Mar. 23, 2026).

[3] *Epic Sys. Corp. v. Health Gorilla, Inc.*, No. 2:26-cv-00321 (C.D. Cal. filed Jan. 13, 2026), Compl. ¶¶ 1-5, 139, 146, 161, 174, 176-177 (alleging that entities connected through Health Gorilla improperly accessed, from Epic customers alone, more than 42,000 patient records through RavillaMed, more than 140,000 through Mammoth, more than 100,000 through SelfRx, and more than 6,000 through GuardDog, all under purported treatment-purpose access through the Carequality and TEFCA frameworks); docket available at CourtListener.

monitoring for patients, but that did not happen. For the duration of its existence, its business instead focused on requesting, reviewing, and summarizing medical records, and providing those medical records to law firms."[4] GuardDog further stated that it believed Health Gorilla was aware of its business activities.

8.    As a direct and proximate result of Defendants' respective failures to exercise reasonable care in vetting, monitoring, overseeing, and safeguarding the patient data and exchange pathways at issue, Plaintiff's and Class Members' sensitive personal and medical information was accessed by entities with no legitimate treatment purpose and disclosed without authorization. Plaintiff and Class Members face a heightened and ongoing risk of identity theft, medical identity fraud, and other harms. Plaintiff has already experienced incidents consistent with misuse of her exposed information, including increased spam communications and suspicious fraudulent activity, as described more fully below.

9.  Plaintiff brings this action seeking compensatory damages, restitution, injunctive relief, and all other relief the Court deems just and proper.

## THE PARTIES

10.  Plaintiff Justina Pabon is, and at all relevant times was, an individual and citizen of the State of Connecticut residing in Hartford, Connecticut. Plaintiff is a patient of Trinity Health. On or about March 13, 2026, Plaintiff received a data breach notification letter from Trinity informing her that her personal and health information may have been compromised in connection with the unauthorized access described herein. Plaintiff's notification letter stated that the information

---

[4] Stipulated Judgment & Permanent Injunction, *Epic Sys. Corp. v. Health Gorilla, Inc.*, No. 2:26-cv-00321 (C.D. Cal. filed Mar. 13, 2026) (GuardDog admitting focus on "requesting, reviewing, and summarizing medical records, and providing those medical records to law firms" and belief that Health Gorilla was aware); *see also* Epic.com, Defendant GuardDog Telehealth Admits to Providing Patient Records to Law Firms (Mar. 13, 2026), https://www.epic.com/epic/post/defendant-guarddog-telehealth-admits-to-providing-patient-records-to-law-firms.

potentially disclosed included clinical care details, demographic information, insurance information, and potentially driver's license numbers.

11. Following the Data Breach, Plaintiff experienced a marked increase in spam telephone calls and spam emails to the contact information she had provided to Trinity. Plaintiff also began receiving notifications and confirmation emails for purchases she did not make, as well as attempted fraudulent charges on her accounts that did not go through. The timing and nature of these incidents are consistent with the unauthorized disclosure of Plaintiff's personal information as described herein. Upon information and belief, these incidents are attributable to the compromise of Plaintiff's Private Information[5] in connection with the Data Breach.

12. Defendant Trinity Health Corporation is a private, not-for-profit corporation incorporated under the laws of the State of Indiana, with its principal place of business in Livonia, Michigan. Trinity operates more than 92 hospitals in 25 states and employs more than 133,000 colleagues and nearly 39,000 physicians and clinicians. Trinity is a covered entity under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").

13. Defendant Health Gorilla, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business in Coral Gables, Florida. Health Gorilla operates a health information network and interoperability platform that provides access to patient medical records through nationwide data exchange frameworks including TEFCA and Carequality. Health Gorilla provides its services to healthcare organizations and other entities throughout the United States.

---

[5] As used herein, "Private Information" refers to the sensitive personal and protected health information potentially disclosed, including clinical care details, demographic information, insurance information, and driver's license numbers.

## JURISDICTION AND VENUE

14.  This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5,000,000, exclusive of interest and costs. Upon information and belief, the proposed Class consists of well in excess of 100 members. Minimal diversity exists because Plaintiff is a citizen of the State of Connecticut, Defendant Trinity is an Indiana corporation with its principal place of business in Michigan, and Defendant Health Gorilla is a Delaware corporation with its principal place of business in Florida.

15.  This Court has personal jurisdiction over Defendant Trinity because Trinity's principal place of business is located in Livonia, Michigan, within this judicial district, and Trinity regularly conducts substantial business in this District. This Court has personal jurisdiction over Defendant Health Gorilla because Health Gorilla provides its interoperability platform and health information exchange services to healthcare organizations in Michigan, including Trinity, and the acts and omissions giving rise to Plaintiff's claims arise from and relate to Health Gorilla's provision of those services to Michigan-based entities.

16.  Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) because Defendant Trinity resides in this District and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District, including Trinity's collection, maintenance, and making available of patient information through its Michigan-based operations and systems, and the resulting unauthorized access to such information through the Health Gorilla-connected exchange pathway.

## FACTUAL ALLEGATIONS

*The Health Information Exchange Framework*

17.   The nationwide health information exchange ecosystem is built on trust. Two major frameworks—the Trusted Exchange Framework and Common Agreement ("TEFCA"), sponsored by the federal government, and Carequality, a private-sector interoperability framework—facilitate the electronic exchange of patient medical records among healthcare providers. Together, these frameworks are responsible for more than one billion patient-record exchanges each month.

18.   These frameworks are designed to ensure that when a patient seeks care at a new provider, the treating clinician can access the patient's relevant medical history regardless of where that history was created. To participate, entities must attest that they are accessing patient records for legitimate treatment purposes and must comply with applicable federal and state laws, including HIPAA.

19.   Entities known as Qualified Health Information Networks ("QHINs") and Implementers serve as gatekeepers to these frameworks. They control which entities may connect to the frameworks and thereby gain access to patient data. As gatekeepers, QHINs and Implementers bear critical obligations, including vetting prospective participants, monitoring their activity, and enforcing reasonable controls designed to ensure that access is used only for legitimate purposes.

20.   Defendant Health Gorilla operates as both a QHIN under TEFCA and an Implementer under Carequality. In that dual capacity, Health Gorilla controlled which entities could access patient records through these nationwide frameworks. Once an entity was onboarded by Health Gorilla, it could access real-time patient data from any participating healthcare provider—requiring only basic demographic information such as a patient's name and address to retrieve that patient's medical records.

*Health Gorilla's Failure to Vet and Monitor Its Clients*

21. According to the Epic Complaint, Health Gorilla onboarded multiple entities to the Carequality and TEFCA frameworks that were not legitimate healthcare providers and were not accessing patient records for treatment purposes.

22. Among the entities Health Gorilla onboarded was RavillaMed PLLC ("RavillaMed"), which had previously been removed from the Carequality framework by another implementer, Metriport, after Metriport grew suspicious of its activities. Despite this red flag, Health Gorilla onboarded RavillaMed to both Carequality and TEFCA in October 2024. From October 2024 through December 2025, RavillaMed accessed over 42,000 patient records from Epic-using providers alone, purportedly for treatment purposes.

23. The Epic Complaint alleges that RavillaMed shared far fewer records with other providers than it retrieved, and the documents it did share contained no evidence of any treatment of patients by a clinician. Instead, the returned documents incorporated previous diagnoses frequently involved in litigation and other material that lacked any clinical value—what the Epic Complaint characterizes as "clinical camouflage" designed to conceal the true purpose of the records access.

24. The Epic Complaint further alleges that the owner of RavillaMed, Dr. Avinash Ravilla, is married to the Director of Patient Records and Automation at LlamaLab, Inc., a company that openly markets same-day patient record retrieval services to law firms. Despite these apparent connections and other alleged red flags, Health Gorilla onboarded RavillaMed and, upon information and belief, failed to adequately investigate or act upon the relationship between RavillaMed and LlamaLab.

25. Health Gorilla similarly onboarded other entities alleged to be engaged in the same or similar conduct, including Mammoth Path Solutions/MammothDx, SelfRx (also known as

8

Myself.Health), Unit 387 LLC, GuardDog Telehealth, Integritort, and Constant Care Health, among others. According to the Epic Complaint, when one entity was discovered and removed from the frameworks, the same actors created new companies to continue the same conduct. The Epic Complaint characterizes this pattern as operating "like a Hydra: when one fraudulent entity is exposed, the bad actors birth a new one."

***The GuardDog Telehealth Admission***

26.  On or about March 14, 2026, GuardDog Telehealth entered into a stipulated judgment and permanent injunction with Epic in the California litigation. In that filing, GuardDog made the following admissions:

a)  GuardDog admitted that "since it began operating as a company in 2024, its goal was to provide chronic care management and remote patient monitoring for patients, but that did not happen."

b)  GuardDog admitted that "for the duration of its existence, its business instead focused on requesting, reviewing, and summarizing medical records, and providing those medical records to law firms."

c)  GuardDog conceded that some of the records it accessed on behalf of law firms "may have been medical records of patients of OCHIN's and Epic's healthcare provider customers, including plaintiffs Reid Health, Trinity Health Corporation and UMass Memorial Health Care, Inc."

d)  GuardDog stated that it believed Health Gorilla was aware of GuardDog's business activities to provide medical records to law firms.

e)  GuardDog further stated that it believed, "based on conversations with and representations made by Meredith Manak of Unit 387 and representatives of Health

Gorilla," that it was permissible to request medical records through the Carequality framework using a treatment purpose and then share those records with law firms.

27. Under the terms of the stipulated judgment, GuardDog agreed to be permanently barred from requesting patient records through the TEFCA and Carequality frameworks and to delete all patient health information or records it obtained through those frameworks.

28. GuardDog's admissions are significant because they indicate, from a participant in the scheme itself, that patient medical records, including, by GuardDog's own concession, records of Trinity patients, were accessed under false pretenses and provided to law firms rather than used for treatment.

***The Unauthorized Access to Trinity Patient Data***

29. Trinity participates in automated electronic data exchanges with health information exchanges to ensure that patient data can be accessed by other healthcare providers for treatment purposes, regardless of where the provider is located. Trinity's participation in these frameworks is required under applicable federal regulations designed to promote interoperability and prevent information blocking.

30. On or about January 13, 2026, Trinity was notified by its HIE partner that there had been a potential unauthorized disclosure of the protected health information of Trinity patients. The HIE partner informed Trinity that a Health Gorilla HIE member had exchanged requests for patient records on behalf of certain other companies, stating the information was needed for treatment purposes, but the HIE partner had been unable to confirm Health Gorilla's statements or whether the recipient companies had the necessary authorizations for the information they obtained (the "Data Breach").

31. On or about March 13, 2026, approximately 59 days after learning of the potential unauthorized disclosure, Trinity began notifying affected patients by letter. The notification letter

stated that the health information that may have been disclosed "varies based on the content of the information exchanged but may have included clinical care details, demographic information, insurance information, and potentially driver license numbers" (collectively, the "Private Information").

32.  The notification letter further stated that the companies involved in the unauthorized access had been "suspended from participation in the HIE while this matter is being investigated." Trinity offered affected individuals complimentary credit monitoring and identity theft protection services.

33.  The total number of Trinity patients affected by the Data Breach has not been publicly disclosed as of the date of this filing. Trinity has reported to the Massachusetts Attorney General that 51 Massachusetts residents were affected, but that figure represents only a single state. Given that Trinity operates 92 hospitals in 25 states, and given that it is among the healthcare providers whose patients' records were accessed through the Health Gorilla pathway, the total number of affected Trinity patients is believed to be materially larger than the Massachusetts figure alone. The precise scope will be ascertainable through Defendants' records.

34.  Other major healthcare systems have disclosed similar unauthorized access through the same Health Gorilla pathway. The University of Pittsburgh Medical Center ("UPMC"), which operates more than 40 hospitals and 800 outpatient sites, has publicly disclosed that its patient records were similarly accessed through Health Gorilla under the pretext of treatment.

***The Data Breach Was Foreseeable and Preventable***

35.  The unauthorized access to Trinity patient data was a foreseeable and preventable consequence of Defendants' respective failures to fulfill their obligations to safeguard patient information.

36. With respect to Defendant Trinity, the Data Breach resulted from Trinity's failure to: (a) exercise reasonable oversight over the third-party health information exchange frameworks and partners through which Trinity's patient data was made accessible, including by taking reasonable steps to confirm that those partners maintained adequate vetting and monitoring procedures for downstream participants; (b) implement reasonable safeguards, contractual controls, and oversight mechanisms designed to detect and respond to suspicious or anomalous access patterns affecting its patient data; (c) take timely action to investigate and respond to red flags or concerns about the integrity of the HIE access pathway; and (d) provide timely notice to affected patients once the potential unauthorized disclosure was identified.

37. With respect to Defendant Health Gorilla, the Data Breach resulted from Health Gorilla's failure to: (a) adequately vet entities before onboarding them to the Carequality and TEFCA frameworks; (b) investigate and act upon red flags, including the prior removal of RavillaMed from the Carequality framework by another implementer; (c) monitor the access patterns of its onboarded entities for signs of misuse, including lopsided record retrieval-to-sharing ratios and the absence of legitimate clinical documentation; (d) investigate the relationships between its onboarded entities and non-treatment commercial enterprises such as LlamaLab; and (e) respond appropriately when concerns were raised by Epic and other providers about the activities of its clients.

38. The risk of unauthorized access to patient data through health information exchange frameworks was well known to both Defendants. The healthcare industry has experienced a dramatic increase in data breaches in recent years, and the potential for misuse of interoperability frameworks by entities seeking access for non-treatment purposes was foreseeable. Defendants were on notice of these risks and failed to take reasonable steps to mitigate them.

*Defendants' Legal Obligations to Protect Patient Information*

39.  As a covered entity under HIPAA, Trinity was required to implement administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and availability of electronic protected health information ("ePHI"). These obligations include, among others: ensuring the confidentiality and integrity of ePHI (45 C.F.R. § 164.306(a)(1)); protecting against reasonably anticipated threats to the security of ePHI (45 C.F.R. § 164.306(a)(2)); protecting against reasonably anticipated uses or disclosures not permitted under the HIPAA Privacy Rule (45 C.F.R. § 164.306(a)(3)); implementing policies and procedures to prevent, detect, contain, and correct security violations (45 C.F.R. § 164.308(a)(1)(i)); and implementing procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports (45 C.F.R. § 164.308(a)(1)(ii)(D)).

40.  As a QHIN under TEFCA and an Implementer under Carequality, Health Gorilla was subject to contractual and regulatory obligations to safeguard the patient data that flowed through its platform. Upon information and belief, Health Gorilla's agreements with Carequality and the TEFCA Recognized Coordinating Entity imposed obligations to vet and monitor its connected participants and to maintain controls reasonably designed to limit access to permitted purposes. Health Gorilla's own website represents that it provides "ironclad data security, privacy, and governance" that "protects patient data."

41.  The Federal Trade Commission ("FTC") has issued numerous guides for businesses highlighting the importance of implementing reasonable data security practices. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

42. Defendants' failure to comply with these regulatory frameworks and industry standards in safeguarding patient data is evidence that they breached the applicable standard of care. Plaintiff does not assert a private right of action under HIPAA or the FTC Act, but relies on these regulatory frameworks as evidence of the applicable standard of care.

***Harm to Plaintiff and Class Members***

43. As a result of the Data Breach, Plaintiff's and Class Members' Private Information—including clinical care details, demographic information, insurance information, and potentially driver's license numbers—has been accessed by entities with no legitimate treatment purpose. Upon information and belief, the accessed data has been used for non-treatment commercial purposes, including being provided to law firms, without Plaintiff's or Class Members' knowledge or consent.

44. The nature of the unauthorized access in this case is particularly concerning because it was deliberate and purposeful, not the result of a random cyberattack. Entities onboarded by Health Gorilla specifically targeted patient medical records for non-treatment exploitation. The GuardDog admission confirms that at least one such entity accessed records for the express purpose of providing them to law firms. This deliberate, targeted access creates a substantially higher risk of ongoing misuse than a typical data breach, because the entities that accessed the data did so with the specific intent to use it for purposes other than patient care.

45. The categories of information compromised—clinical care details, demographic information, insurance information, and potentially driver's license numbers—are precisely the types of information that can be used to perpetrate identity theft, insurance fraud, medical identity fraud, and other cybercrimes. Clinical care details and medical histories are particularly sensitive because they cannot be changed, they reveal the most intimate aspects of a person's life, and they can be used to target individuals for scams, fraud, and other misuse.

14

46.  Plaintiff Pabon has experienced concrete and particularized injuries following the Data Breach, including but not limited to:

a)  A marked increase in spam telephone calls to the phone number she provided to Trinity, beginning after the Data Breach and consistent with the compromise of her contact information;

b)  A marked increase in spam emails to the email address she provided to Trinity, beginning after the Data Breach;

c)  Receipt of notifications and confirmation emails for purchases she did not make, consistent with unauthorized use of her personal information;

d)  Attempted fraudulent charges on her accounts that did not go through;

e)  Time and effort spent monitoring her financial accounts and personal information for unauthorized activity as a direct consequence of the Data Breach;

f)  Anxiety and emotional distress arising from the knowledge that her sensitive personal and medical information has been accessed by unauthorized third parties for non-treatment purposes;

g)  Substantial time and effort spent dealing with the consequences of the Data Breach, which included and continues to include time spent verifying the legitimacy and impact of the unauthorized access, exploring credit monitoring and identity theft insurance options, self-monitoring accounts, and seeking legal counsel regarding options for remedying and/or mitigating the effects of the Data Breach. This time has been lost forever and cannot be recaptured; and

h)  The loss of the benefit of the bargain she struck with Trinity when she provided her Private Information as a condition of receiving healthcare services.

47.  Plaintiff and Class Members face a substantial, imminent, and ongoing risk of identity theft, medical identity fraud, insurance fraud, and other misuse of their Private Information. Plaintiff and Class Members have a continuing interest in ensuring that their Private Information, which remains in Defendants' possession or control, is protected and safeguarded from further misuse. This risk is concrete and ongoing, not merely hypothetical: the entities that accessed the data did so deliberately and for non-treatment commercial purposes, at least one entity has admitted to providing the data to law firms, and the data includes the types of personal and medical information that are highly valuable to identity thieves and are actively traded on illicit markets.

48.  There is a well-documented time lag between when personal information is compromised and when it is used to commit identity theft. According to the U.S. Government Accountability Office, stolen data may be held for a year or more before being used, and once stolen data has been sold or posted online, fraudulent use of that information may continue for years. Plaintiff and Class Members will need to remain vigilant in monitoring their financial, medical, and personal accounts for the indefinite future.

49.  The timing of Trinity's notification compounded the harm to Plaintiff and Class Members. Trinity learned of the potential unauthorized disclosure on or about January 13, 2026, but did not begin notifying affected patients until on or about March 13, 2026—a period of approximately 59 days. During this period, Plaintiff and Class Members were unaware that their Private Information had been compromised and were unable to take steps to protect themselves, such as placing fraud alerts, monitoring their accounts, or freezing their credit.

## CLASS ACTION ALLEGATIONS

50.  Plaintiff brings this action on behalf of herself and all others similarly situated as a class action pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure. Plaintiff seeks to represent the following class (the "Nationwide Class" or the "Class"):

All individuals in the United States whose personally identifiable information and/or protected health information was accessed, disclosed, or otherwise compromised as a result of the unauthorized access to Trinity Health patient data through the Health Gorilla health information exchange platform.

51. Excluded from the Class are: (a) Defendants and any entities in which Defendants have a controlling interest; (b) Defendants' officers, directors, agents, and employees; (c) the Judge assigned to this case and any member of the Judge's immediate family and judicial staff; and (d) all persons who properly and timely opt out of the Class.

52. Plaintiff reserves the right to amend the Class definition as appropriate based on discovery and further investigation.

53. *Numerosity.* The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class Members is not yet known to Plaintiff, Trinity operates 92 hospitals in 25 states and is among the healthcare providers whose patients' records were accessed through the Health Gorilla pathway. Trinity has reported 51 affected individuals to the Massachusetts Attorney General alone, and the total number of affected patients across all 25 states in which Trinity operates is believed to be substantially larger. The identities and addresses of Class Members are readily ascertainable from Defendants' records.

54. *Typicality.* Plaintiff's claims are typical of the claims of the Class. Plaintiff and all Class Members were patients of Trinity whose Private Information was accessed and disclosed through the same Health Gorilla platform, by the same or similarly situated entities, using the same false treatment-purpose pretexts. Plaintiff's claims arise from the same course of conduct by Defendants and are based on the same legal theories as the claims of the Class.

55. *Adequacy.* Plaintiff is an adequate representative of the Class. Plaintiff's interests do not conflict with the interests of the other Class Members she seeks to represent. Plaintiff has retained counsel experienced in complex class action litigation, including data breach class actions,

17

and will prosecute this action vigorously on behalf of the Class. Plaintiff's interests are aligned with those of the Class, and Plaintiff is prepared to fairly and adequately represent the Class.

56. ***Commonality and Predominance.*** Common questions of law and fact predominate over any individualized questions and include, but are not limited to:

a) Whether Defendants owed a duty to protect Plaintiff's and Class Members' Private Information;

b) Whether Defendants breached their respective duties of care;

c) Whether Trinity exercised reasonable care in overseeing the pathways through which its patient data was made accessible;

d) Whether Health Gorilla's vetting and monitoring of its onboarded entities were reasonable;

e) Whether Defendants' conduct violated applicable standards of care, including those informed by HIPAA, HITECH, and FTC guidelines;

f) Whether Defendants' notification to affected individuals was timely and adequate;

g) Whether Plaintiff and Class Members suffered legally cognizable damages as a result of the Data Breach; and

h) Whether Plaintiff and Class Members are entitled to injunctive and equitable relief.

57. ***Superiority.*** A class action is superior to any other available means for the fair and efficient adjudication of this controversy. The damages suffered individually by Plaintiff and the other Class Members are relatively small compared to the burden and expense that would be required to litigate their claims on an individual basis. Individualized litigation would create a

potential for inconsistent or contradictory judgments and would increase delay and expense for all parties and the court system. The class action device presents fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

## COUNT I
## NEGLIGENCE
**(On Behalf of Plaintiff and the Nationwide Class Against All Defendants)**

58.  Plaintiff realleges and incorporates by reference the allegations in paragraphs 1 through 57 as if fully set forth herein.

59.  To obtain healthcare services from Trinity, Plaintiff and Class Members were required to provide their sensitive personal and health information to Trinity. That information was collected, stored, and maintained by Trinity as part of its operations and was made accessible through health information exchange frameworks in which Health Gorilla served as a gatekeeper. Plaintiff and Class Members reasonably expected Defendants to safeguard their Private Information consistent with applicable legal obligations, industry standards, and Defendants' own representations.

60.  Defendant Trinity owed a duty of care to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, and protecting their Private Information from unauthorized access and disclosure. This duty arose from the special relationship between Trinity and its patients, from applicable laws and regulations including HIPAA and the HITECH Act,[6] from industry standards for healthcare data security, and from Trinity's own

---

[6] *See*, *e.g.*, 45 C.F.R. §§ 164.306(a)(1)-(3) (requiring covered entities to ensure the confidentiality, integrity, and availability of ePHI and to protect against reasonably anticipated threats and unauthorized uses or disclosures); 45 C.F.R. § 164.308(a)(1)(i)-(ii) (requiring administrative safeguards including policies to prevent, detect, and correct security violations and regular review of system activity such as audit logs).

representations regarding the protection of patient information. This duty included a duty to exercise reasonable care in selecting, overseeing, and managing the third-party exchange relationships and partners through which Trinity's patient data was made accessible, and to take reasonable steps to ensure that those partners maintained adequate safeguards against unauthorized access.

61.    Defendant Health Gorilla owed a duty of care to Plaintiff and Class Members to exercise reasonable care in its capacity as a gatekeeper to the Carequality and TEFCA frameworks. This duty arose from Health Gorilla's role as a QHIN and Implementer, from the foreseeability that inadequate vetting and monitoring of onboarded entities would result in unauthorized access to patient data, from applicable laws and regulations, from industry standards, and from Health Gorilla's own representations that it provides "ironclad data security, privacy, and governance." This duty included a duty to conduct adequate due diligence before onboarding entities, to monitor the access patterns of onboarded entities for signs of misuse, and to investigate and act upon red flags.

62.    Defendants breached their respective duties of care. Trinity breached its duty by, among other things: (a) failing to exercise reasonable oversight over the HIE frameworks and partners through which its patient data was accessible; (b) failing to ensure that those partners, including Health Gorilla, maintained adequate vetting and monitoring procedures for downstream participants; (c) failing to implement reasonable safeguards within its own systems to detect anomalous access patterns to its patient data; and (d) failing to provide prompt notice sufficient to allow affected patients to take protective measures after the potential unauthorized disclosure was identified.

20

63. Health Gorilla breached its duty by, among other things: (a) failing to adequately vet entities before onboarding them to the Carequality and TEFCA frameworks; (b) onboarding RavillaMed despite its prior removal from the Carequality framework by another implementer; (c) failing to investigate the relationships between its onboarded entities and non-treatment commercial enterprises; (d) failing to monitor access patterns for signs of misuse, including lopsided record retrieval-to-sharing ratios and the absence of legitimate clinical documentation; (e) failing to respond appropriately to concerns raised by Epic and other providers; and (f) enabling the continued access of entities it knew or should have known were accessing patient data for non-treatment purposes.

64. It was reasonably foreseeable that Defendants' failures to exercise reasonable care would result in unauthorized access to and disclosure of Plaintiff's and Class Members' Private Information.

65. As a direct and proximate result of Defendants' negligence, Plaintiff and Class Members have suffered and will continue to suffer injury, including but not limited to: (a) unauthorized access to and disclosure of their Private Information; (b) a substantially increased and ongoing risk of identity theft, medical identity fraud, and other misuse; (c) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and fraud; (d) lost opportunity costs associated with efforts to mitigate the consequences of the Data Breach; (e) the continued risk to their Private Information, which remains in Defendants' possession; (f) the diminution in value of their Private Information; (g) the loss of the benefit of the bargain; and (h) emotional distress and anxiety.

66. Neither Plaintiff nor the other Class Members contributed to the Data Breach described in this Complaint.

21

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff and the Nationwide Class Against Defendant Trinity)**

67.  Plaintiff realleges and incorporates by reference the allegations in paragraphs 1 through 57 as if fully set forth herein.

68.   When Plaintiff and Class Members provided their Private Information to Trinity in exchange for healthcare services, they entered into implied contracts with Trinity pursuant to which Trinity agreed to reasonably protect such information from unauthorized access and disclosure.

69.   Trinity solicited, offered, and invited Class Members to provide their Private Information as part of Trinity's regular business practices. Plaintiff and Class Members accepted Trinity's offers and provided their Private Information to Trinity in connection with healthcare services. In doing so, Plaintiff and Class Members reasonably believed and expected that Trinity's data security practices complied with relevant laws and regulations, including HIPAA, and were consistent with industry standards.

70.  Plaintiff and Class Members paid money to Trinity, or money was paid on their behalf, with the reasonable belief and expectation that Trinity would use part of its resources to maintain adequate data security, including reasonable oversight of the third-party frameworks through which patient data was made accessible. Trinity failed to do so.

71.  Plaintiff and Class Members would not have entrusted their Private Information to Trinity in the absence of the implied contract to keep their information reasonably secure.

72.  Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Trinity.

73.  Trinity breached the implied contracts with Plaintiff and Class Members by failing to safeguard and protect their Private Information, including by failing to exercise reasonable

oversight over the entities accessing Trinity patient data through health information exchange frameworks.

74. As a direct and proximate result of Trinity's breach, Plaintiff and Class Members have suffered damages, including the loss of the benefit of the bargain, out-of-pocket expenses, and the other injuries described herein.

**COUNT III**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Nationwide Class Against Defendant Trinity)**
**(Pleaded in the Alternative to Count II)**

75. Plaintiff realleges and incorporates by reference the allegations in paragraphs 1 through 57 as if fully set forth herein.

76. Plaintiff and Class Members conferred a monetary benefit on Trinity. Plaintiff and Class Members paid money, or had money paid on their behalf, for healthcare services from Trinity. In connection with those services, Plaintiff and Class Members provided their Private Information to Trinity. A portion of those payments was intended, among other things, to fund reasonable data security measures, including reasonable oversight of the third-party frameworks through which patient data was made accessible.

77. Trinity knew that Plaintiff and Class Members conferred benefits which Trinity accepted. Trinity profited from these transactions and from its use of Plaintiff's and Class Members' Private Information for business purposes.

78. Trinity enriched itself by saving the costs it reasonably should have expended on adequate oversight and data security measures. Instead of investing in reasonable safeguards, Trinity utilized cheaper, less effective security and oversight measures, prioritizing its own resources over the requisite protection of patient data.

23

79. Under the principles of equity and good conscience, Trinity should not be permitted to retain the benefits conferred upon it by Plaintiff and Class Members because Trinity failed to implement appropriate data security and oversight measures as mandated by applicable regulations, industry standards, and its own representations.

80. Plaintiff and Class Members have no adequate remedy at law.

81. As a direct and proximate result of Trinity's conduct, Plaintiff and Class Members have suffered injury as described herein.

82. Trinity should be compelled to disgorge into a common fund, for the benefit of Plaintiff and Class Members, the proceeds it unjustly received.

**COUNT IV**
**INVASION OF PRIVACY / INTRUSION UPON SECLUSION**
**(On Behalf of Plaintiff and the Nationwide Class Against Defendant Health Gorilla)**

83. Plaintiff realleges and incorporates by reference the allegations in paragraphs 1 through 57 as if fully set forth herein.

84. Plaintiff and Class Members had a reasonable expectation of privacy in their Protected Health Information, including their clinical care details, demographic information, insurance information, and driver's license numbers. This information was entrusted to their healthcare providers for the sole purpose of facilitating medical treatment.

85. Health Gorilla, by onboarding entities to the Carequality and TEFCA frameworks without adequate vetting and by facilitating those entities' access to Plaintiff's and Class Members' most sensitive medical records under false pretenses, enabled an intrusion upon the seclusion and private affairs of Plaintiff and Class Members that would be highly offensive to a reasonable person. Upon information and belief, Health Gorilla knew or was reckless in not knowing that entities it onboarded were accessing patient records for non-treatment commercial purposes, as

24

evidenced by the red flags described herein and by GuardDog's admission that it believed Health Gorilla was aware of its actual business activities.

86.   The intrusion was into the most private of domains—confidential patient medical records—and was accomplished through deliberate misrepresentations of treatment purpose by entities that Health Gorilla, as gatekeeper, was obligated to vet and monitor. The entities that accessed the data did so not for any legitimate healthcare purpose, but to exploit patient records for commercial gain, including providing records to law firms and other third parties for non-treatment purposes.

87.   As a direct and proximate result of Health Gorilla's conduct, Plaintiff and Class Members have suffered injury, including but not limited to the loss of privacy in their most sensitive medical information, emotional distress, and the other injuries described herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that this Court enter judgment in her favor and against Defendants, and grant the following relief:

A.   An Order certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

B.   An award of compensatory, consequential, and general damages in an amount to be determined at trial;

C.   An award of punitive or exemplary damages against Health Gorilla for its reckless or intentional conduct as alleged in Count IV;

D. Equitable and injunctive relief requiring Defendants to: (i) implement and maintain reasonable data security practices and adequate oversight of health information exchange partnerships; (ii) submit to future annual audits of those practices; (iii) provide Plaintiff and Class Members with extended credit monitoring and identity theft protection services at no cost, including coverage for medical identity theft, in an amount and duration to be determined by the Court; and (iv) establish a process by which Plaintiff and Class Members may receive timely notification of any future data security incidents;

E. An award of restitution and disgorgement as permitted by law;

F. An award of reasonable attorneys' fees, costs, and expenses;

G. Pre-judgment and post-judgment interest as permitted by law; and

H. Such other and further relief as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all claims and issues so triable.

Dated: March 23, 2026

Respectfully submitted,

*/s/ Nick Suciu III*_____
Nick Suciu III
**BRYSON HARRIS SUCIU & DEMAY PLLC**
6905 Telegraph Rd., Suite 115
Bloomfield Hills, MI 48301
(616) 678-2180
nsuciu@brysonpllc.com

*Attorneys for Plaintiff and the Proposed Class*